IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No.: 3:24-CR-00034 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JAMES R. KNEPP, II |
| v. | ) | |
| | ) | |
| MICHAEL SCHERER, | ) | GOVERNMENT'S RESPONSE IN |
| | ) | OPPOSITION TO DEFENDANT'S |
| Defendant. | ) | MOTION TO SUPPRESS (Doc. 16) |
| | ) | |

Defendant, Michael Scherer, filed a motion asking this Court to suppress evidence seized from the search of his residence, as well as statements he made (Doc. 16). The search was conducted pursuant to lawfully issued search warrant that were supported by probable cause his statements made by the Defendant were made voluntarily. The Court should deny his motion.

**INTRODUCTION/BACKGROUND**

In August 2019, a foreign law enforcement agency (referenced herein as "FLA") known to the FBI and with a history of providing reliable accurate information in the past, notified the FBI that FLA determined that on May 5, 2019, a user of IP address 104.60.139.30 accessed online child sexual abuse and exploitation material via a website. (Gov. Ex. 1 Search Warrant Affidavit at ¶21). FLA described the website as having "an explicit focus on the facilitation of sharing child abuse material (images, links, and videos), emphasis on indecent material of boys. Users were able to view some material without creating an account. However, an account was required to post and access all content." *Id*. FLA provided further documentation

1

naming the site it described above as the Target Website, which the FLA referred to by its actual name. *Id.*

As described with in the search warrant affidavit, the Target Website could not generally be accessed through the traditional internet. Only a user who had installed the appropriate Tor software on the user's computer could access the Target Website. Even after connecting to the Tor network, however, a user would have to find the 16-character web address of the Target Website in order to access it. *Id.* at ¶ 24.

IP address 104.60.139.30, which was used to access the Target Website on May 5, 2019, was registered to AT&T. *Id.* at ¶ 28. On September 11, 2019, a subpoena/summons was issued to AT&T regarding the IP address in question. A review of the results obtained on September 14, 2019 identified the following account holder and address, which is the address of the SUBJECT PREMISES:

**Subscriber Name:** Michael Scherer

**Address:** 207 E. Broadway Street

Maumee, Ohio 43537

**Phone:** (419) 304-1134

**Email:** topaz111@ameritech.net

A search of a public records database that provides names, dates of birth, addresses, associates, telephone numbers, email addresses, and other information was conducted for Michael Scherer. These public records indicated that Michael Scherer's current address is 207 E. Broadway Street, Maumee, Ohio 43537. *Id.* at ¶ 30.

A check with the Department of Motor Vehicles on or about November 26, 2019 and again on June 4, 2021 revealed that an individual named Michael Scherer with a date of birth

2

of December 11, 1958, was living at the address. Additionally, a check with the Maumee Police Department for any calls for service involving Michael D. Scherer only revealed one call for service on September 11, 2019. Michael D. Scherer found a wallet and contacted the Police, and provided his address as 207 E. Broadway Street, Maumee, Ohio. This was also the same address and name within U.S. Postal Service records. *Id*. at ¶¶31-35.

Michael Scherer owns and operates a website www.mdscherer.com, which says it belongs to M.D. Scherer & Company. The company offers Unique and Rare Books and DVD's. The website lists an address at 207 E. Broadway Street, Maumee, Ohio. The website also lists Contact Information at the same address. *Id*. at ¶ 37.

On July 28, 2021, a search warrant was authorized by Magistrate Darrell Clay for the residence at 207 E. Broadway Street, Maumee, Ohio, and the person of Michael Scherer. On July 29, 2021, FBI executed the search warrant. Defendant, Michael Scherer, was the only occupant at the home. He was then interviewed in a vehicle outside of the home. The entire interview was less than one hour. The following are relevant excerpts from the interview. (Gov. Ex. 2)

**Agent Hunt**: I just want to make it clear too, this is a search warrant. You're not under arrest. Okay?
**Defendant**: Okay.
**Agent Hunt**: So, you're free to go. You're free to leave if you want to and not stay here. We obviously have a search warrant at your house so we are gonna be here for a little while okay? Now, like Amy was talking, she told you what we are here about. We both know that's no surprise to you. It would be important for us to be able to speak to you about what's going on. So that's.. that's why we are here.
**Defendant**: I understand. I understand. I mean, I know it's a problem and stuff. I just don't want to go to jail or anything. I'm sorry for the whole thing and I've lived to it for 62 years. And I just don't wanna…
**TFO Gloor**: What are you living with?
**Defendant**: My attraction. I mean I'm not gonna lie about it.
(5:04-5:58)

**TFO Gloor**: So, what are you attracted to? Boys? Girls?

3

**Defendant**: I mean, should I be saying this in front of you or a lawyer or something?
**TFO Gloor**: That's up to you. That's up to you. We wanna give you a fair chance to explain yourself and mayb help us with what you have there. Like Alex said you don't have to talk to us.
**Defendant**: Where do I get a lawyer if I do?
**TFO Gloor**: You can look in the yellow pages or online or anything like that.
**Agent Hunt**: So, what kinda happens from here is we are basically fact collectors. We are doing a search warrant and we're obviously we know we are gonna find some stuff in the house. We just talked about your attraction for 60 plus years. Again, we aren't here to judge you. Ultimately what happens is we have prosecutors who know what we are doing here. And theyre gonna want us to come back to them and give us what we found basically, okay? And we want to be able to paint you in the best light possible, that he was cooperative, that he cooperated with us and you have been. We appreciate that. You've been a gentleman and not everyone is so cooperative. So part of that is being able to paint you in the bst light possible and part of that is hearing your side of the story. And it sounds like you would agree that this is a problem. We speak to a lot of people. We work violent crimes, violent crimes against children. We deal with people who kidnap kids, bury them in the backyard, chop them up, that type of thing. That's the reality of what we deal with, and we don't know if that's you or not.
**Defendant**: No that's not.
**Agent Hunt**: Well, we don't know that.
**Defendant**: Ive never even had contact with a person.
**Agent Hunt**: But we don't know that. We don't know your credibility without talking to you and seeing if your honest about stuff and that's kinda what this does. That gives us a platform, or baseline so to speak of your honesty of what youre saying and what we are gonna find in there
**Defendant**: Mmmhmm
**Agent Hunt**: Because when we find that those things don't match up, our red flags go off, okay what else is he lying about, whats the extent of what this guy..
**Defendant**: Oh Im not lying. Im just saying I don't know anything about this. I don't want to say maybe say a bunch of stuff that's gonna be used against me because I don't know. I don't know that..you know youre trusting me and Im tryusting you but I don't know how that's not gonna happen.
**TFO Gloor**: So we already know we are gonna find stuff in there right?
**Defendant**: I don't know exactly what youre looking for. I don't know whats legal and what isn't.
**TFO Gloor**: So anyone under the age of 18. Child Pornography. If theyre naked and in certain positions that kind of stuff. Okay? And we know we are gonna find that kind of stuff. And we know we are gonna find that in there.
**Defendant**: How do you know?
**TFO Gloor**: Well we wouldn't be here.
**Defendant**: Can I ask you how in the world?
**TFO Gloor**: We have investigative ways.
**Defendant**: Really?
**TFO Gloor**: But, Well sometimes it takes a little longer.
**Defendant**: I haven't done that in a long time.
**TFO Gloor**: Okay well sometimes it takes a little longer
**Agent Hunt**: You haven't done what in a long time?
**Defendant**: Gotten anything like that. I mean what I have is what I have but I mean its not like.

4

**Agent Hunt**: But its been a while?
**Defendant**: Well yeah
**Agent Hunt**: Okay
**TFO Gloor**: What's a while. Like years months or days?
**Defendant**: Months.
**Agent Hunt**: You been trying to stop?
**Defendant**: Yeah, I mean its an addiction. That's another thing.
(6:09-9:46)
….

**Defendant**: You say Im not under arrest, can I just go back home?
**TFO Gloor**: Well, we are gonna finish our search warrant.
**Defendant**: Yeah
**TFO Gloor**: And then, I mean we would make you sit somewhere so you don't interfere with the warrant. I mean you're here? You know what I mean? Our intent isn't…
**Defendant**: If something is going to happen, should I get an attorney?
**TFO Gloor**: I cant give you.
**Defendant**: Well no is something going to happen?
**TFO Gloor**: Again, youre here for child pornography, so its gonna take a while to get through all tht because we do a lot of these cases so forensics wise theres a lon line to get in. So it might take 6 months to a year before we say that's what we found.
**Defendant**: What do I do about my business?
**TFO Gloor**: Well like I said we are gonna take computers and all that stuff. Do you have more than one computer?
**Defendant**: No but its all on the computer
**TFO Gloor**: Well okay
**Defendant**: I sell product and stuff
**TFO Gloor**: Well we are gonna take what there is there now
**Defendant:** for 6 months?
**TFO Gloor**: Well maybe longer depending on what, you know I cant tell you how long honestly because again we have a lot of these cases and we kinda get put in an order. You know what I mean, unfortunately. But if you need to go buy another computer you can do that
**Defendant**: Oh no its all on there. Umm Wow
(10:38-12:16)
….

**Defendant**: I mean do they like show up in the night because theyere gonna get me for something?
**TFO Gloor**: No No No No No, not at all. Not at all.
Will they give notice or say such and such? Im sure I will have to get an attorney or something?
**TFO Gloor**: Clearly and if you cant afford one. One will be provided to you if that's what you want to do.
**Defendant**: Nothing today is gonna be in the newspaper?
**TFO Gloor**: People will talk obviously.
(20:58-21:31)

5

**TFO Gloor**: So, Michael, what we do sometimes to make sure you aren't touching kids is we ask you to take a polygraph to see if we are dealing with someone who just is looking. Just is looking. Not touching, not marrying, not hurting kids, anything like that. We want to make sure no one is hurting any kids.
**TFO Gloor**: Would you be willing to take a polygraph?
**Defendant**: Now, I'd have to get an attorney for that, is that part of an arrest then?
No, you can drive there and we can take you and bring you back.
**Defendant**: You mean right now?
**TFO Gloor**: Yeah
**Defendant**: I can drive there. What kind of an attorney would this be?
**TFO Gloor**: Criminal. Criminal Attorney if that's what you mean.
Yeah. Let me do that first and see what's going on. Yeah I don't have a problem taking one. I don't know this stuff. I mean you see on tv they say you should never talk to them without an attorney. And I've probably talked too much. Its not that I don't trust you.
(30:10-31:38)

## LAW AND ARGUMENT

**A. The Affidavit Was Supported By Probable Cause And The Agent Provided Reliable Information To The Magistrate Judge.**

"Probable cause is defined as reasonable grounds for belief, supported by less than *prima facie* proof but more than mere suspicion, and is said to exist when there is a fair probability, given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place." *United States v. Lattner*, 385 F.3d 947, 951-52 (6th Cir. 2004). The test for probable cause is simply whether "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. Murphy*, 241 F.3d 447, 457 (6th Cir. 2001).

Determinations of probable cause are based on a review of the "totality-of-the-circumstances," and involve a practical, common sense review of the facts available to the officer at the time of the search. *Gates*, 462 U.S. at 230. "An issuing judge's finding of probable cause should be given great deference by the reviewing court and should not be reversed unless arbitrarily exercised." *United States v. Miller,* 314 F.3d 265, 268 (6th Cir. 2002). As long as the issuing judge had a "substantial basis" for determining that the search would uncover evidence of

6

wrongdoing, the warrant must be upheld. Furthermore, the reviewing court is confined to the information within the four corners of the affidavit supporting the search warrant request. *United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006).

This Court's function in reviewing the sufficiency of probable cause in an affidavit submitted in support of a search warrant is not to substitute its judgment for that of the issuing judge by conducting a de novo determination as to whether it would have issued the warrant based upon the same affidavit. *Gates*, supra at 236. Rather, the issuing judge's "determination of probable cause should be paid great deference by reviewing courts." *Id.* "[T]he resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *Id.* at 237, footnote 10 citing *United States v. Ventresca*, 380 U.S. 102, 109 (1965).

The *Gates* decision provides considerable elaboration as to the "fair probability" standard applicable to the issuing judge's probable cause determination.

> [T]he term 'probable cause,' according to its usual acceptation, means less than evidence which would justify condemnation . . . . It imports a seizure made under circumstances which warrant suspicion. More recently, we said that "the *quanta* . . . of proof" appropriate in ordinary judicial proceedings are inapplicable to the decision to issue a warrant. *Brinegar*, 338 U.S., at 173. Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the magistrate's decision . . . . [I]t is clear that "only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause." *Spinelli*, 393 U.S., at 419.

*Gates,* supra at 235.

Finally, in determining whether probable cause exists in order to issue a warrant, judges are entitled to draw common sense conclusions about human behavior. *Brown*, supra. The evidence presented in support of a warrant may be evaluated in terms understood by those versed

7

in the field of law enforcement. *United States v. Cortez*, 449 U.S. 411 (1981). In other words, while a judge cannot rely exclusively on an officer's conclusions, a judge evaluating information provided by police should respect an officer's common sense deductions about human behavior. *Brown*, supra.

The affidavit in support of the search warrant executed at the defendant's residence spelled out in great detail the criminal activity that led to the issuance of the warrant. The warrant thoroughly described Target Website, how it operated, and the quality and quantity of child pornography content that was available on it. (Ex. 1, at ¶¶ 16-28). It detailed the network that Target Website operated on and the affirmative steps users needed to take in order to access Target Website. *Id*.

The affidavit also thoroughly described in great detail the child pornography accessed by the IP address ultimately tied to the defendant. The affidavit next details the further investigation that led to the search of the defendant's home. In particular, it set forth how analysis of data gathered through the image hosting website, open-source information, and subsequent follow up via administrative subpoenas revealed that the individual utilizing Target Website is an individual residing at defendant's home address. *Id*. at ¶ 40.

Defendant's access to child pornography images on the Target Website provides strong evidence that he possesses the material. See *United States v. Wagers*, 452 F.3d 534, 540 (6th Cir. 2006) (noting that "evidence that a person has visited or subscribed to websites containing child pornography supports the conclusion that he has likely downloaded, kept, and otherwise possessed the material."). Several courts have recognized, however, that "evidence that a person has visited or subscribed to websites containing child pornography supports the conclusion that he has likely downloaded, kept, and otherwise possessed [child pornography]." *United States v.*

8

*Wagers*, 452 F.3d 534, 540 (6th Cir.2006)(citing *United States v. Martin*, 418 F.3d 148, 157 (2nd Cir.2005); *United States v. Froman*, 355 F.3d 882, 890-891 (5th Cir.2004)).

Since the materials are illegal to distribute and possess, initial collection is difficult, collectors are unlikely to destroy them. Due to their illegality and the imprimatur of severe social stigma such images carry, collectors will want to secret them in secure places, like a private residence.

Further, in *United States v. Gourde*, the Ninth Circuit stated that an individual's mere status as a member of a website that contains child pornography images, even a website that also contains legal pornographic images, manifests that individual's intention and desire to obtain illegal images. *United States v. Gourde*, 440 F .3d 1065, 1070 (9th Cir.2006). The Gourde court noted that this is especially true where an individual is required to take several steps to gain membership to a website containing child pornography. *Id*.

Defendant also contends the affidavit is stale because it was the Target Website was accessed in 2019 and the search warrant was not executed until 2021. (Doc. 42, PageID 41). Several courts, including the 6th Circuit, have held delays of this nature do not render child pornography search warrants state. It is well-established that the "same time limitations that have been applied to more fleeting crimes do not control the staleness inquiry for child pornography." *United States vs. Lewis*, 605 F.3d at 402, (6th Cir. 2010) (citing Paull, 551 F.3d at 522). That is because we have noted in child-pornography cases that "[i]mages typically persist in some form on a computer hard drive even after the images have been deleted and ... can often be recovered by forensic examiners." *Id*. (quoting *United States v. Terry*, 522 F.3d 645, 650 n. 2 (6th Cir. 2008) (internal quotation marks omitted)). Further, child pornography "is generally carried out in the secrecy of the home and over a long period." *Paull*, 551 F.3d at 522. This is particularly due

9

to the fact that child pornography collectors typically keep images and videos for several years and the nature in which computers can store information. *United States v. Morales–Aldahondo*, 524 F.3d 115, 119 (1st Cir.2008) (holding that a more than three-year lapse between the defendant's purchase of child pornography and the warrant application did not render the information stale because a special agent attested that those who download child pornography tend to retain images for years and use computers to augment and store collected images); *United States v. Eberle*, 266 Fed.Appx. 200, 205–06 (3d Cir.2008) (holding that three-and-a-half-year-old information was not stale "because individuals protect and retain child pornography for long periods of time as child pornography is illegal and difficult to obtain"); *United States v. Irving*, 452 F.3d 110, 116, 125 (2d Cir.2006) (rejecting staleness argument where warrant was issued based on, among other things, various letters the defendant wrote two or more years earlier about his past sexual exploitation of children, a five-year-old witness statement, child erotica images on diskettes found five years earlier in the defendant's luggage, and five-year-old identifications by children who witnessed the defendant sexually abuse young boys); *United States v. Riccardi*, 405 F.3d 852, 861 (10th Cir.2005) (finding five-year-old information relied upon in part in issuing search warrant was not stale).

      Here, the affidavit clearly establishes that the Defendant took several steps to access the website known to contain child pornography and that did in fact contain child pornography. *Ex. 1,* at ¶¶ 24-26. Moreover, the affiant opined based upon her training and experience and the specific facts of the investigation that the target of the investigation was likely to have collected child pornography materials in the target's home. *Id*. ¶40. A court is entitled to rely on an affiant's expertise regarding characteristics and tendency of child pornography consumers when determining whether there is sufficient probable cause to issue a warrant. *United States v.*

*Watzman*, 486 F.3d 1004, 1008 (7th Cir. 2007) (explaining district court entitled to rely on affiant's expertise regarding tendency of child pornography consumers to "hoard collections at home" in concluding probable cause existed to search defendant's home).

The affidavit also established probable cause to show that the defendant still lived at the house in 2021, when the search warrant was executed. *Ex. 1,* at ¶¶ 31-37.

The issuing magistrate therefore made a practical, common-sense decision, that, given all of the circumstances set forth in the affidavit before him, there was a fair probability that contraband or evidence of a crime would be found at that particular place. The defendant's accessing of child pornography images on Target Website supported the belief that there was probably evidence of his receipt and possession of child pornography on one or more computers at his residence.

**B.     The Good Faith Exception Applies To The Officers Executing The Warrant.**

Even if this Court could somehow determine Defendant has met his burden to establish a false or misleading statement was knowingly made by the affiant of the search warrant affidavit, and that the statement was necessary to a finding of probable cause, the United States, in the alternative, argues that the good faith exception applies. Courts have universally recognized a good faith exception to the exclusionary rule, even in cases where a warrant is later found to be defective, so long as the executing officers relied upon it in good faith and that reliance was objectively reasonable. *United States v. Leon*, 468 U.S. 897 (1984).

**C. Defendant's Statements Were Made Voluntarily**

Defendant contends Defendant's statements were custodial and were coerced, therefore should be suppressed. (Doc. 16, Page ID#22). Law enforcement officials are required to advise a person of their Miranda rights before engaging in "custodial interrogation." See *Miranda v.*

11

*Arizona*, 384 U.S. 436, 444–45, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). As the quoted phrase implies, this requirement applies "only where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). In determining whether a person is "in custody" for purposes of Miranda, courts look to "the objective circumstances of the interrogation ... to determine how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action[.]" *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009) (internal quotation marks and citation omitted). The ultimate inquiry is whether, under the totality of the circumstances, the interviewee's freedom of movement was restrained to a degree associated with formal arrest. Id. If so, he is "in custody" for purposes of Miranda. Guiding the inquiry are four, non-exhaustive factors: "(1) the location of the interview; (2) the length and manner of the questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he or she did not need to answer the questions." *United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010).

Once a suspect invokes the *Miranda* right to counsel regarding one offense, he may not be re-approached regarding that offense or any other offense unless counsel is present. *Arizona v. Roberson*, 486 U.S. 675, 686–87 (1988). This is a "bright-line rule." *United States v. Potter*, 927 F.3d 446, 450 (6th Cir. 2019). In order to benefit from this rule's protection, however, a defendant must clearly invoke his right to counsel. That is, he "must make a 'statement that can be reasonably construed to be an expression of a desire for the assistance of an attorney.'" *United States v. Zakhari*, 85 F.4th 367, 375 (6th Cir. 2023) (quoting *Davis*, 512 U.S. at 459).

When evaluating the court uses a three-part inquiry to determine whether a confession is

12

involuntary under the Due Process Clause. We ask: first, whether the police activity was "objectively coercive"; second, whether that coercion was "sufficient to overbear the defendant's will"; and third, whether the coercive conduct was "the crucial motivating factor in the defendant's decision to offer the statements." *Binford*, 818 F.3d at 271 (quoting *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999)).

Defendant was repeatedly advised he was not in custody. He was immediately advised why Agents executed the search warrant. *Ex. 2*, 2:45. Agent Hunt told him "You're not under arrest you are free to leave" within the first few minutes. *Ex. 2*, 5:04. Even viewed in the totality of the circumstances, he was interviewed outside his home, in a vehicle. The length lasted less than an hour. There were no restraints on the Defendant, such as hand cuffs, a locked room, etc. Again, he was told he was not under arrest and was free to leave.

During the interview, Defendant made repeated statements about an attorney, but never clearly asked for one. He inquired where he could find one, what type of attorney he would need, and stated he wanted to talk to one if he did a polygraph. *Ex*. 2, 6:15-6:41, 30:10.

## CONCLUSION

For the reasons stated above, the United States respectfully requests that the Court deny Defendant's Motion to Suppress Evidence.

Respectfully submitted,
REBECCA C. LUTZKO
United States Attorney

By:      /s/ *Sara Al-Sorghali*
Sara A. Al-Sorghali (OH: 0095283)
Assistant United States Attorney
Four Seagate, Suite 308
Toledo, OH 43604
(419) 259-6376
(419) 259-6360 (facsimile)
Sara.Al-Sorghali@usdoj.gov

13