# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | CASE NO. 3:24 CR 34 |
| Plaintiff, | |
| v. | JUDGE JAMES R. KNEPP II |
| **MICHAEL SCHERER,** | |
| Defendant. | **MEMORANDUM OPINION AND ORDER** |

## INTRODUCTION

Currently pending before the Court is Defendant Michael Scherer's motion to suppress. (Doc. 16). Scherer seeks to suppress: (1) evidence obtained by virtue of a search warrant he contends was not supported by probable cause; and (2) statements he made to law enforcement officers which he asserts were made without proper *Miranda* warnings, or alternatively, were not voluntarily made. The Government opposed (Doc. 18), and Scherer replied (Doc. 22).

## BACKGROUND

On July 28, 2021, a magistrate judge issued a search warrant for Scherer's residence and person. (Doc. 18-1). FBI Task Force Officer ("TFO") Amy Gloor authored the affidavit in support of the search warrant. *See id.* at 39. On July 29, 2021, law enforcement officers executed the search warrant. Scherer was then interviewed for approximately fifty-five minutes in a vehicle outside the residence by TFO Gloor and FBI Special Agent Alex Hunt. (Ex. 2, Doc. 19) (audio recording). Various devices and electronics were seized and searched during the warrant's execution.

On February 7, 2024, Scherer was charged in a single-count indictment with receipt and distribution of child pornography in violation of 18 U.S.C. § 2252(a)(2). (Doc. 1). He now seeks to suppress the evidence seized pursuant to the search warrant and the statements he made to law enforcement officers.

## DISCUSSION

Scherer raises two arguments in favor of suppression: (1) the search warrant was not supported by probable cause; and (2) his statements to law enforcement were given without proper *Miranda* warnings, or alternatively, were not voluntarily made. For the reasons discussed below, the Court denies Scherer's motion to suppress.

Probable Cause

Scherer contends the affidavit presented in support of the search warrant at issue lacked probable cause. He argues the affidavit averred he accessed the target website a single time and lacked any indication of what was viewed or whether anything was downloaded. (Doc. 16, at 4). He further contends that, apart from the officer's "generalized state[ment] that the website was dedicated to the sexual exploitation of minors and/or prepubescent males, there is nothing concrete within the four corners of the document that can suggest or even demonstrate what material, if any, was accessed by Defendant's IP address on May 5, 2019." *Id.* at 5.

Scherer next contends that even if a single visit to the website is sufficient probable cause, the cited information was stale as the search warrant was not obtained and executed until July 2021, almost twenty-six months after the access. *Id.* at 5-6. The Government responds that the affidavit provided probable cause and the information was not stale.

The Fourth Amendment to the United States Constitution provides "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the

2

place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV. To establish probable cause, officers must establish "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Put another way, there must be a "nexus" between the "place" to be searched and the "things" to be seized. *United States v. Reed*, 993 F.3d 441, 447 (6th Cir. 2021). "Probable cause is defined as 'reasonable grounds for belief, supported by less than *prima facie* proof but more than mere suspicion.'" *United States v. King*, 227 F.3d 732, 739 (6th Cir. 2000) (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)).

Whether the affidavit gives rise to this fair probability "depends on the totality of the circumstances." *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005) (citing *Gates*, 462 U.S. at 230). "The probable cause standard is a 'practical, non-technical conception' that deals with the 'factual and practical considerations of everyday life.'" *Id.* (quoting *Gates*, 462 U.S. at 231); *see also Gates*, 462 U.S. at 231 (highlighting the "common-sense conclusions about human behavior" that are integral to an analysis of probable cause); *Florida v. Harris*, 568 U.S. 237, 244 (2013) (describing a "practical and common-sensical standard" underlying the analysis of probable cause).

In assessing the sufficiency of an affidavit supporting a warrant, the Court looks only to the four corners of the affidavit. *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010). To encourage use of the warrant procedure, a magistrate judge's probable-cause determination is afforded "great deference" and should be reversed only if the issuing judge arbitrarily exercised his discretion. *Gates*, 462 U.S. at 236 (quotation omitted); *see also United States v. Baker*, 976 F.3d 636, 646 (6th Cir. 2020) (recognizing courts' obligation to give issuing judges the benefit of the doubt in "doubtful or marginal cases"); *United States v. Brown*, 732 F.3d 569, 573 (6th Cir.

3

2013) ("[W]e may only reverse a magistrate's decision to grant a search warrant if the magistrate arbitrarily exercised his or her authority."); *United States v. Lapsins*, 570 F.3d 758, 763 (6th Cir. 2009) ("[S]o long as the magistrate had a substantial basis for . . . concluding that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more.").

Although Scherer argues the website was operated as an online forum and the search warrant lacked information suggesting that he actually accessed CSAM during the one cited visit, the affidavit itself states:

> In August 2019, a foreign law enforcement agency (reference herein as "FLA"), known to the FBI and with a history of providing reliable accurate information in the past, notified the FBI that FLA determined that on May 5, 2019, a user of IP address 104.60.139.30 *accessed online child sex abuse and exploitation material via a website*. FLA described the website as having "an explicit focus on the facilitation of sharing child abuse material (images, links, and videos), emphasis on indecent material of boys. Users were able to view some material without creating an account. However, an account was required to post and access all content." FLA provided further documentation naming the site it described above as the TARGET WEBSITE, which the FLA referenced to by its actual name.

(Doc. 18-1, at 16) (emphasis added). That is, although Scherer characterizes the affidavit as simply describing a "visit" or "access" to the website, the affidavit itself states that the identified IP address accessed child sexual abuse material ("CSAM"). The Sixth Circuit has explained "evidence that a person has visited or subscribed to websites containing child pornography supports the conclusion that he has likely downloaded, kept, and otherwise possessed the material." *United States v. Wagers*, 452 F.3d 534, 540 (6th Cir. 2006). On the other hand, the Court finds the Government's statement, that "[t]he affidavit also thoroughly described in great detail the child pornography accessed by the IP addressed tied to the defendant" (Doc. 18, at 8), is an overstatement. Although the affidavit details the type of material available on the website and its focus, it does not detail what *specific* material (other than "child sex abuse and exploitation material") was accessed by the target IP address.

4

Nevertheless, the Court is mindful of the "practical and common-sensical standard" underlying the analysis of probable cause. *Harris*, 568 U.S. at 244. Here, not only does the affidavit state that the target IP address "accessed online child sex abuse and exploitation material via a website", it further details that the website had "an explicit focus on the facilitation of sharing child abuse material" (and "was dedicated to the sexual exploitation of minor and/or prepubescent males"), that the Tor-network-based website was difficult to access ("could not generally be accessed through the traditional internet" (Doc. 18-1, at 17)), and that "it is extremely unlikely that any user could simply stumble upon the TARGET WEBSITE without understanding its purpose and content" (Doc. 18-1, at 18). Taking the allegations in the affidavit as a whole, the Court finds they provide probable cause. The affidavit further details (and Scherer does not challenge in the present motion) that the IP address identified is connected to his residence.

Scherer next argues that the information in the affidavit was stale given the length of time that passed between the date the IP address accessed the website and the date the search warrant was issued. The affidavit states that the IP address accessed online child sex abuse and exploitation material on May 5, 2019; the search warrant was issued on July 28, 2021, almost twenty-six months later. The Government responds that staleness is evaluated differently in the child pornography context, and this information was not stale such that the warrant lacked probable cause. In the alternative, the Government contends the *Leon* good faith exception applies.

Stale information cannot support probable cause for a search warrant. *United States v. Frechette*, 583 F.3d 374, 377 (6th Cir. 2009). Information is stale when, because of the passage of time, it no longer suggests a fair probability that evidence of crime will be found at the search

5

location. *United States v. Abboud*, 438 F.3d 554, 572 (6th Cir. 2006). There is no mechanical calculation for determining whether information is stale. Rather, staleness depends on the "circumstances of each case" and the "nature of the crime" at issue. *United States v. Paull*, 551 F.3d 516, 522 (6th Cir. 2009) (quoting *United States v. Hython*, 443 F.3d 480, 485 (6th Cir. 2006)). To evaluate whether information in a warrant affidavit is stale, courts consider four factors: (1) the character of the crime; (2) the extent of the defendant's movement from place to place; (3) the life span of the evidence to be seized; and (4) the location to be searched. *Frechette*, 583 F.3d at 378.

As to the first factor, character of the crime, the Sixth Circuit has explained that possession of child pornography "is generally carried out" continuously "over a long period," so the "time limitations that have been applied to more fleeting crimes do not control the staleness inquiry for child pornography." *Paull*, 551 F.3d at 522. Indeed, the Sixth Circuit itself has found time periods up to sixteen months not stale in the child pornography context. *See Frechette*, 583 F.3d at 378-79 (sixteen months); *Paull*, 551 F.3d at 522 (thirteen months); *Lapsins*, 570 F.3d at 767 (almost 9 months); *United States v. Lewis*, 605 F.3d 395, 402 (6th Cir. 2010) (more than 7 months); *United States v. Elbe*, 774 F.3d 885, 890 (6th Cir. 2014) (7 months); *United States v. Terry*, 522 F.3d 645, 650 n.2 (6th Cir. 2008) (5 months). Thus, this factor weighs against a finding of staleness.

As to the second factor, the extent of the defendant's movement from place to place, the search warrant affidavit here establishes Scherer was entrenched and not nomadic. *See* Doc. 18-1, at 19-20 (stating, *inter alia*, the IP address was registered to Scherer at the residence, Scherer's current address was the residence, Scherer had purchased the residence in May 1990 with no additional sales noted, Scherer was – in 2021 – receiving mail at the residence, and records

showed a landline phone number associated with the residence in Scherer's name from 2017 to the time of the affidavit (2021)). Thus, this factor weighs against a finding of staleness.

As to the third factor, the life span of the evidence to be seized, the Sixth Circuit in *Frechette* observed that, unlike in the drug trade where older contraband is likely to have been moved, consumed, or destroyed, images of child pornography "can have an infinite life span." 583 F.3d at 378-79. This factor, again, weighs against a finding of staleness.

Finally, as to the fourth factor, the place to be searched, the search warrant affidavit requested a search of Scherer's residence and person. The allegations centered on the IP address associated with Scherer and his residence. In *Paull*, the Sixth Circuit explained the crime of possession of child pornography "is generally carried out in the secrecy of the home and over a long period." 551 F.3d at 522; *see also United States v. Fabian*, 2010 WL 3906701, at *4 (E.D. Mich.) ("Courts, in discussing child pornography crimes, have observed that collectors of child pornography prefer to keep their collections in secure, private locations, such as a home or office.") (citing *Frechette*, 583 F.3d at 379). This factor also weighs against a finding of staleness.

Although the Court is mindful that there is some limit on the bounds of evidence not becoming stale,, even in the child pornography context, it finds this case does not cross the line. *See, e.g.*, *United States v. Prideaux-Wentz*, 543 F.3d 954, 958-59 (7th Cir. 2008) ("[W]e decline to find that evidence [of child pornography] that is two to four years old is stale as a matter of law.") (collecting cases); *United States v. Morales-Aldahondo*, 524 F.3d 115, 119 (1st Cir. 2008) (holding that a three-year delay between acquisition of child pornography and application for search warrant did not render the supporting information stale since "customers of child pornography sites do not quickly dispose of their cache"); *United States v. Eberle*, 266 F. App'x

200, 205-06 (3d Cir. 2008) (finding three-and-a-half year old information not stale "because individuals protect and retain child pornography for long periods of time as child pornography is illegal and difficult to obtain."). Considering all the factors, the Court finds that the evidence presented was not stale and the warrant was supported by probable cause.

*Good Faith Exception*

Even if the Court were to find the evidence presented was stale and the warrant lacked probable cause, it would find suppression inappropriate based on the good faith exception.

Generally, the exclusionary rule and the fruit of the poisonous tree doctrine serve to exclude all evidence seized as a result of a defective warrant. In *United States v. Leon*, the Supreme Court held that even if evidence was seized pursuant to a warrant unsupported by probable cause, the exclusionary rule does not apply if an objectively reasonable officer could have relied on the warrant in good faith in executing the search. 468 U.S. 897, 926 (1984); *United States v. Laughton*, 409 F.3d 744, 748 (6th Cir. 2005) (citing *Leon* for the proposition that "the exclusionary rule should not bar the government's introduction of evidence obtained by police officers acting in objectively reasonable reliance on a search warrant that is subsequently invalidated.") The Supreme Court has identified four situations in which an officer's reliance would not be objectively reasonable: (i) "if the magistrate or judge in issuing a warrant was misled by information in an affidavit" that violated *Franks*; (ii) "where the issuing magistrate wholly abandoned his judicial role"; (iii) when the warrant is "based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (iv) when a warrant is "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to

8

be valid." *Leon*, 468 U.S. at 923 (punctuation modified). Scherer's arguments here only arguably implicate the third scenario.

Showing good-faith reliance is a less demanding standard than proving the existence of probable cause. *United States v. Carpenter*, 360 F.3d 591, 595 (6th Cir. 2004). Good-faith reliance requires "a minimally sufficient nexus between the illegal activity and the place to be searched . . . even if the information provided was not enough to establish probable cause." *Id.* at 596. A bare bones affidavit "that states only suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge" is insufficient to sustain good-faith reliance. *United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017) (punctuation modified). However, "[i]f the reviewing court is able to identify in the averring officer's affidavit some connection, regardless of how remote it may have been—some modicum of evidence, however slight—between the criminal activity at issue and the place to be searched, then the affidavit is not bare bones and official reliance on it is reasonable." *Id.* (punctuation modified).

Here, the Court finds the affidavit was not "bare bones," and an officer's reliance on the search warrant was reasonable. The affidavit describes that the identified IP address, associated with Scherer's residence, "accessed online child sex abuse and exploitation material via a website." It also detailed the steps necessary to access the Tor-network-based website. The affidavit was therefore not "'completely devoid of any nexus' between [Scherer's] home and the child pornography allegations." *United States v. Kinison*, 710 F.3d 678, 686 (6th Cir. 2013) (quoting *Carpenter*, 360 F.3d at 595-96); *cf. Fabian*, 2010 WL 3906701, at *4-5 (finding seventeen year old information stale, but applying the *Leon* good faith exception based on in part

9

on courts' repeated statements that a longer staleness time frame is appropriate in child pornography cases).

The Court therefore finds that, even if the information provided was stale and the warrant was not supported by probable cause, there was an indicia of probable cause such that, pursuant to the *Leon* good faith exception, exclusion would not be warranted.

Defendant's Statements

Scherer provides two alternative arguments in support of his motion to suppress his statements to law enforcement. First, he seemingly contends he was subject to a custodial interrogation without being properly provided *Miranda* warnings. In the alternative, he contends his statements were involuntary and "made pursuant to unconstitutionally coercive and deceptive police tactics". (Doc. 16, at 7).

The Fifth Amendment states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "[T]he Fifth Amendment privilege . . . serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves." *Miranda v. Arizona*, 384 U.S. 436, 467 (1966).

In *Miranda*, the Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444. While "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, . . . police officers are not required to administer

*Miranda* warnings to everyone whom they question." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). Instead, "*Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Id.*

To determine whether an individual was "in custody," the court must ask "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (footnote omitted). These two questions inform "the ultimate inquiry[:] simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quoting *Mathiason*, 429 U.S. at 495). The determination of custody "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994). Some factors to consider include:

> (1) the purpose of the questioning;
>
> (2) whether the place of the questioning was hostile or coercive;
>
> (3) the length of the questioning; and
>
> (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police or voluntarily admitted the officers to the residence and acquiesced to their requests to answer some questions.

*United States v. Salvo*, 133 F.3d 943, 950 (6th Cir. 1998); *see also Howes v. Fields*, 565 U.S. 499, 509 (2012) (internal citations omitted) (naming the following factors: "the location of the questioning, its duration, statements made during the interview, the presence or absence of

11

physical restraints during the questioning, and the release of the interviewee at the end of the questioning").

Applying those factors here, the Court finds that, under the totality of the circumstances, Scherer was not restrained from movement to the degree of formal arrest and was not subject to a custodial interrogation. The questioning took place in a vehicle outside Scherer's residence with two officers, a factor that arguably weighs in favor of finding the interview custodial. But the fact that questioning takes place in a "coercive environment" is insufficient in and of itself to constitute custody:

> [A] noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question.

*Mathiason*, 429 U.S. at 495; *see also United States v. Phillip*, 948 F.2d 241, 247 (6th Cir. 1991) ("Coercive environments not rising to the level of formal arrest or restraint on freedom of movement do not constitute custody within the meaning of *Miranda*."); *cf. United States v. Martinez*, 795 F. App'x 367, 375 (6th Cir. 2019) (finding where defendant was "confined to a conference room in which two armed FBI agents were seated between him and a closed door" was "not nearly enough" to prove it was a custodial interrogation).

Weighing in opposition to the arguably coercive environment of the vehicle and against finding the interview custodial is that Scherer was told very early on in the questioning that he was not in custody and that he was free to leave. The Sixth Circuit has explained that a clear statement that one is free to leave and not required to answer officers' questions is "a particularly important factor in showing that no custody occurred." *United States v. Panak*, 552 F.3d 462,

467 (6th Cir. 2009). In *Panak*, the Sixth Circuit explained that while such an advisement is not necessary to a finding that an interrogation is non-custodial, it is a weighty factor: "but to say that such a clear warning likely would have guaranteed the noncustodial nature of this interview is not to say that its absence transformed the meeting into an arrest-like situation. In a close case, sure enough, the existence of such advice might affect the outcome." *Id.* at 468.

Although he was questioned in a vehicle, the first minute of the interaction involved agents helping Scherer put on and adjust a mask (for COVID-19 safety reasons). TFO Gloor then explained why the agents were at his house (Ex. 2, at 2:30-3:28) (to execute a search warrant for child pornography). After some brief discussion about what Scherer did for a living, Agent Hunt told him: "I just want to make it clear too, this is a search warrant. You're not under arrest, okay? . . . So, you're free go. You're free to you know, leave if you know, you want to and not stay here." *Id.* at 5:06-:16. After Scherer asked, "I mean, should I be saying this in front of you or a lawyer or something?", TFO Gloor stated: "That's up to you. That's up to you. We want to give you a fair chance to explain yourself and maybe help us with what you have up there. Like Alex said, you don't have to talk to us." *Id.* at 6:12-:31. Scherer also argues that "[w]hile he was told he was free to leave, at later points he asked if he could go back inside and was unable to do so as the agents coerced him into talking further." (Doc. 22, at 9). A full review of this interaction demonstrates, however, that although Scherer was told he could not interfere with the execution of the search warrant, he was not told he was not free to leave:

> Scherer: You say I'm not under arrest, can I just go back home, or?
>
> Gloor: Well, we're gonna finish our search warrant.
>
> Scherer: Yeah.
>
> Gloor: And then, I mean so we would kinda make you sit somewhere where we could keep an eye on you just so you don't interfere with the warrant.

13

      Scherer:        Oh, yeah.

      Gloor:         And then, I mean you're here. You know what I mean?

      Scherer:        Mm hmm.

(Ex. 2, at 10:41-:59). Later, a similar exchange occurred where Scherer stated he would head inside and was again told by officers that he would have to sit somewhere out of the way, for safety reasons. *Id.* at 49:36-50:13. These interactions do not suggest that officers restricted Scherer's ability to end the interview, leave the car, or go elsewhere, only that he was informed he would not be able to return to his home in an unrestricted manner given the ongoing execution of the warrant.

      The duration of the interview, slightly less than one hour, also weighs against a finding that Scherer was in custody. *See, e.g.*, *United States v. Mahan*, 190 F.3d 416, 420-22 (6th Cir. 1999) (finding an interview lasting one-and-a-half hours was non-custodial); *Martinez*, 795 F. App'x at 374 ("The district court found that the length of the interview (eighty minutes) was not itself problematic. We agree."); *United States v. Gillman*, 432 F. App'x 513, 516 (6th Cir. 2011) ("Gillman was questioned for eighty minutes and we have refused to find a defendant in custody during interrogations of similar length."); *cf. United States v. Holt*, 751 F. App'x 820, 824 (6th Cir. 2018) (holding an interview of "approximately two hours [ ] support[ed] [defendant's] argument that he was in custody," but was offset by the remainder of the totality of the circumstances); *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) (finding a two-hour long interview to be a factor weighing in favor of finding a defendant in custody).

      Finally, Scherer was not subject to physical restraints such as handcuffs during the interview, and the officers' questioning was never aggressive or threatening. In sum, taking the totality of the circumstances, the Court finds Scherer was not subject to a custodial interrogation.

14

He did not find himself in a situation where a reasonable person would have believed that he was in police custody or not free to terminate the interview.

*Voluntariness*

Scherer further claims that his statements were involuntary due to law enforcement coercion.

"When a defendant claims that a confession was coerced, the government bears the burden of proving by a preponderance of the evidence that the confession was in fact voluntary." *Mahan*, 190 F.3d at 422; *see also Lego v. Twomey*, 404 U.S. 477, 489 (1972). But to find that a confession was involuntary, the court must find:

> (i) the police activity was objectively coercive;
>
> (ii) the coercion in question was sufficient to overbear the defendant's will; and
>
> (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement.

*Mahan*, 190 F.3d at 422. In applying this test, a court must consider the totality of the circumstances to determine whether the defendant's will to resist was overborn by law enforcement's coercive tactics. *United States v. Redditt*, 87 F. App'x 440, 443-44 (6th Cir. 2003).

Here, Scherer alleges that the environment and the line of questioning were coercive. He argues the officers "used cajolery" (Doc. 16, at 7), including "compliment[ing] Defendant on being so cooperative", "coax[ing] and flatter[ing]" him, and suggesting that cooperation would benefit his case. The Court disagrees and finds Scherer's statements were voluntarily made. Although law enforcement certainly used interview techniques that kept Scherer talking, the Court finds they do not rise to the level of coercion. While "promises of leniency may be coercive if they are broken or illusory", *United States v. Johnson*, 351 F.3d 254, 262 (6th Cir.

15

2003), the officers here made no such promises. Rather, they complimented Scherer on his cooperation, told him they were "fact collectors" doing a search warrant who would be reporting back to prosecutors what they found, that they wanted to "paint [him] in the best light possible", and that the prosecution determination is up to prosecutors, and that cooperation and telling the truth is something that "goes a really really long way" with prosecutors. *See* Ex. 2, at 6:46-7:40, 12:40-:58. But, "promises to inform a prosecutor of cooperation do not, *ipso facto*, render a confession coerced." *United States v. Stokes*, 631 F.3d 802, 808 (6th Cir. 2011) (quoting *United States v. Wiley*, 132 F. App'x 635, 640 (6th Cir. 2005)). And, "promises to recommend leniency or speculation that cooperation will have a positive effect do not make subsequent statements involuntary." *United States v. Delaney*, 443 F. App'x 122, 129 (6th Cir. 2011). Indeed, "such statements usually are permissible." *Id.* at 128 (citation omitted). The statements by the officers here fall into the latter category. Further, as noted above, the tone of the interview was friendly, not aggressive. The officers did not act in an overbearing manner, nor did they make threats or promises.

    Scherer also cites his references to an attorney during the interview as a factor demonstrating his statements were coerced. He said:

"I mean, should I be saying this in front of you or a lawyer or something?" (6:12-:15)

"Where do I get a lawyer if I do?" (6:31-:34)

"If something is going to happen, should I get an attorney?" (11:01-:03)

"I'm sure I'll get an attorney or something?" (21:08-:12)

"Now, I'd have to get an attorney for that, is that part of an arrest then?" (30:44-:49)

"What kind of an attorney would this be?" (31:06-:08).

"I guess I'd wanna get an attorney first [before taking a polygraph]." (41:28-:32).

16

"Alright, well, I will see about getting an attorney . . ." (43:34-:37).

To invoke the right to counsel, the accused must make a "statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *Davis v. United States*, 512 U.S. 452, 459 (1994) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991)). As the Sixth Circuit has explained:

> The *Davis* Court established an "objective inquiry"—the suspect "must unambiguously request counsel." *Id.* at 459. Importantly, "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning." *Id.*

*Bush v. Warden, Southern Ohio Corr. Fac.*, 573 F. App'x 503, 511 (6th Cir. 2014).

"If an accused makes a statement concerning the right to counsel 'that is ambiguous or equivocal' or makes no statement, the police are not required to end the interrogation, or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights." *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010) (citation omitted).

None of Plaintiff's statements were a clear invocation of the right to counsel; rather, they were all the sort of statements courts have held to be "ambiguous or equivocal". *See Davis*, 513 U.S. at 462 ("Maybe I should talk to a lawyer."); *Delaney*, 443 F. App'x at 130 ("I think I should talk to a lawyer, what do you think?") *Ledbetter v. Edwards*, 35 F.3d 1062, 1070 (6th Cir. 1994) ("It would be nice to have an attorney."). Further, the officers' responses to these questions do not demonstrate coercion. *See, e.g.*, Ex. 2, at 6:16-:18 (responding that decision about whether to get a lawyer is "up to you"); 6:33-:39 (responding to question about where to find a lawyer with "in the Yellow Pages or online or anything like that"); 21:12-:23 ("Clearly. And if you can't afford one, one will be provided to you, if that's what you want to do."). As such, the Court finds the questioning was not "objectively coercive."

17

The Court further finds the second and third prongs of the *Mahan* test regarding voluntariness are not met. Upon review of the interview as a whole, to the extent there was any coercion here, it was neither sufficient to overbear Scherer's will nor the crucial motivating factor in his decision to make the statements.

For these reasons, combined with those above evaluating whether the interview was custodial, the Court finds the statements by Scherer were voluntarily made and not coerced. As such, Scherer is not entitled to suppression of the statements.

## CONCLUSION

For the foregoing reasons, good cause appearing, it is

ORDERED that Scherer's Motion to Suppress (Doc. 14) be, and the same hereby is, DENIED.

 s/ *James R. Knepp II*
UNITED STATES DISTRICT JUDGE

Dated: January 31, 2025